Susan F. McLAUGHLIN, Plaintiff,

v.

STATE OF NEW YORK, GOVERNOR'S OFFICE OF EMPLOYEE RELA-TIONS; New York State—Council 82/ AFSCME Joint Committee on Quality of Working Life; Council 82/AFSCME; Thomas A. Gibbs; Joseph Puma; and Richard Bischert, Defendants.

No. 89–CV–924.

United States District Court,
N.D. New York.

March 5, 1992.

O'Connell and Aronowitz, Albany, N.Y. (Jeffrey D. Honeywell, E. Michael Ruberti, David M. Cherubin, of counsel), for plaintiff.

Robert Abrams, Atty. Gen., Albany, N.Y. (Randolph F. Treece, Asst. Atty. Gen., of counsel), for State defendants.

Rowley Forrest O'Donnell & Hite, Albany, N.Y. (Richard R. Rowley, David C. Rowley, James J. Seaman, of counsel), for defendants Council 82, Puma and Bischert.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

This action arises under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1—2000e–17 (1988 & West Supp. 1991). Plaintiff alleges that she was sexually harassed by the defendants during her tenure as an employee of the defendant New York State–Council 82/AFSCME Joint Committee on Quality of Working Life. There are three motions now before the court:

1. Defendants' motion for leave to reargue the issues addressed in this court's June 11, 1990 decision;

2. Defendants' motion for summary judgment; and

3. Plaintiff's motion to amend her complaint.

## I. OVERVIEW [1]

From January, 1983 through May, 1988, the plaintiff, Susan McLaughlin, was employed as a staff member by the defendant New York State–Council 82/AFSCME Joint Committee on Quality of Working Life ("QWL Committee"). The QWL Committee was a joint organization comprised of a labor union (New York State Inspection, Security and Law Enforcement Employees, District Council 82 of AFSCME ("Council 82")) and the State (New York State Governor's Office of Employee Relations). The Committee was created to administer funds provided under the collective bargaining agreement between the State and the labor union. *McLaughlin I*, 739 F.Supp. at 99. Defendants Joseph Puma and Richard Bischert were members of the QWL Committee's executive committee. Defendant

Thomas Gibbs was employed by New York State to negotiate and administer labor contracts with Puma's and Bischert's labor union. *Id.* at 100. The QWL Committee was disbanded in May, 1988, thus bringing to an end plaintiff's employment with the committee.

### A. Plaintiff's Claims of Sexual Harassment in the Workplace

On August 26, 1987 and again on June 20, 1988, plaintiff filed complaints with both the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging that the defendants had sexually harassed her at her place of employment. After receiving negative determinations from both entities, plaintiff brought the present action in this court.

Plaintiff states two causes of action in her complaint. Her first cause of action arises from incidents which allegedly occurred while she was employed by the QWL Committee. She alleges that "all of the defendants engaged in or cooperated with sexually discriminatory conduct which adversely affected the terms and conditions of her employment with the QWL Committee," in violation of 42 U.S.C. §§ 2000e–2(a) and (c) (1988). *McLaughlin I*, 739 F.Supp. at 100. The gravamen of this cause of action is that (1) Puma and Bischert created a hostile work environment for plaintiff during her employ, (2) Puma, Bischert, and Gibbs unlawfully retaliated against her after she filed her first complaints of sexual harassment, and (3) the ranking officials from the QWL Committee, the State, and Council 82 knew (or should have known) of Puma's and Bischert's discriminatory and retaliatory conduct, yet took no action to curb it. *See id.* (detailing the incidents alleged).

---

**1.** The complete background of this case is set forth in this court's June 11, 1990 ruling in this case, *McLaughlin v. State of New York*, 739 F.Supp. 97 (N.D.N.Y.1990) (McCurn, C.J.) (hereinafter "*McLaughlin I*"). A comprehensive reiteration of those details is unnecessary to today's discussion. What follows is a review of the facts which are relevant to consideration of the motions now before the court. *See Scottish Air Int'l v. British Caledonian Group, PLC*, 945 F.2d 53, 54 (2d Cir.1991).

Plaintiff's second cause of action, by contrast, arises from the termination of her employment with the QWL Committee. Specifically, she alleges "that Puma, Bischert, and Gibbs acted together to negotiate the QWL Committee out of existence so that they could get rid of 'the human rights problem' presented by her claims that she suffered discrimination on the basis of sex." *Id.* at 101. Stated in procedural terms, the defendants allegedly caused plaintiff's discriminatory or retaliatory termination from the QWL Committee.

In sum, plaintiff's first cause of action relates to the sexual discrimination she allegedly suffered while working for the QWL Committee; her second cause of action relates to her alleged wrongful termination from the Committee.

Before filing the immediate action in this court, plaintiff filed a companion suit in New York State Supreme Court (Albany County) against, *inter alia*, Puma, Bischert, and Gibbs, raising tort claims for (1) intentional infliction of emotional distress, (2) prima facie tort, and (3) tortious interference with contract. In a memorandum-decision dated December 1, 1988, the state court dismissed the plaintiff's entire case, based on that court's finding that plaintiff's dismissal from the QWL Committee was not caused by defendants' acts of sexual discrimination, but rather was the result of a good-faith collective bargaining agreement between the union and the State to disband the committee altogether. *McLaughlin I*, 739 F.Supp. at 103 (citing State Court Record, Vol. I, at 7 (Hughes, J.)).

### B. McLaughlin I

Plaintiff filed this suit in 1989, and defendants immediately moved to dismiss and/or for summary judgment, on four grounds:

1. Plaintiff failed to state a prima-facie case under Title VII;

2. Plaintiff is collaterally estopped from relitigating the issues addressed in the state court proceeding;

3. *Res Judicata* precludes plaintiff from relitigating the incidents alleged in the state court proceeding; and

4. Plaintiff's suit is barred by the statute of limitations.

This court rejected defendants' motion in its entirety, except as it related to collateral estoppel of issues addressed in the state court proceeding. With respect to collateral estoppel, the court rendered the following decision:

> plaintiff is collaterally estopped from relitigating the issue of the reduction in funding of the QWL Committee, and her resultant termination, in this suit. Any errors that *might* have been committed by the state court (such as failure to permit discovery, failure to review the record in a light most favorable to the plaintiff, or failure to provide the plaintiff with sufficient time to develop her case) were subject to appeal—and an appeal was not taken. Plaintiff cannot now contend, in *this* court, that the state was not a full and fair forum.... However, the removal of this issue from relitigation does not void either of plaintiff's claims. There are still valid theories with respect to harassment and retaliation, outside of the termination of plaintiff's job with the QWL Committee, which are not barred by the doctrine of collateral estoppel.

*Id.* at 106 (emphasis in original). Both parties agree that *McLaughlin I* precludes plaintiff from litigating the claims that relate to her termination of employment. The remaining claims at issue pertain to the alleged sexual harassment and retaliation plaintiff endured while still employed by the QWL Committee. *See id.*[2]

---

**2.** There are two separate types of sexual harassment at issue here: (1) "hostile work environment," and (2) *"quid pro quo"* sexual harassment. *See McLaughlin I,* 739 F.Supp. at 102–03.

In *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir.1989), the Second Circuit discussed the distinction between hostile work

environment and *quid pro quo* sexual harassment:

> Two distinct forms of sexual harassment have now been recognized as violating Title VII's prohibitions. One, termed *quid pro quo* sexual harassment, occurs when an employer alters an employee's job conditions or with-

## II. DISCUSSION

### A. Defendants' Motion for Reconsideration

The defendants move for an order, pursuant to Local Rule 10(m), granting them leave to reargue their motion to dismiss and/or for summary judgment that this court previously rejected in *McLaughlin I.* Defendants ask the court to reconsider two rulings in particular:

1. that plaintiff came forth with sufficient evidence to withstand defendant's motion for summary judgment; and

2. that plaintiff satisfied the statute of limitations.

■ The defendants face a difficult challenge in pursuing this motion, because there are generally only three circumstances under which a court will agree to reconsider a prior decision. To successfully prevail upon the court to reconsider, the moving party must show the existence of either: (1) an intervening change of controlling law; (2) the availability of new evidence; and/or (3) the need to correct a clear error or prevent manifest injustice. *Wilson v. Great Amer. Indus.*, 770 F.Supp. 85, 89 (N.D.N.Y.1991) (McCurn, C.J.) (citing *Doe v. New York City Dep't of Social Serv.*, 709 F.2d 782, 789 (2d Cir.), *cert. denied sub nom, Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)). These criteria allow the court to balance the need to review its past decisions, in light of new developments or arguments, against the adversary's need to be protected from protracted relitigation of a thoroughly addressed issue.

Defendants' arguments are wholly devoid of any new authority or evidence to justify reconsideration. Therefore, defendants must base their argument for reconsideration on grounds that a "manifest injustice" will occur if the court does not reconsider its previous rulings. *See Doe*, 709 F.2d at 789.

The basis of defendants' first argument is that the court, in rejecting defendants' motion for summary judgment, relied upon improper affidavits. According to the defense, the material attestations in plaintiff's affidavits were submitted upon the "information and belief" of the affiants, and therefore should not have been considered by the court. *Id.* Without those attestations, the defendants contend, there was insufficient evidence upon which plaintiff could withstand defendants' motion. *Id.; see, e.g., Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (opponent must come forward with some evidence of disputed material fact to withstand motion for summary judgment).

■ Indeed, Fed.R.Civ.P. 56(e) requires that "opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See Schertz v. Waupacka County*, 875 F.2d 578, 582 (7th Cir.1989). Second Circuit case law is relatively clear that affidavits based only "upon information and belief" are not sufficient to defeat a motion for summary judgment, because they are not based upon the requisite first-hand knowledge. *Chandler v. Coughlin*, 763 F.2d 110, 113–14 (2d Cir.1985); *see Smith v. American Express*, 853 F.2d 151, 155 (2d Cir.1988). Therefore, if plaintiff's argument in opposition to summary judgment had relied exclusively upon such evi-

holds an economic benefit because the employee refuses to submit to sexual demands.... The other type of sexual harassment, called hostile work environment, occurs when an employer's conduct " 'has the purposes or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive working environment.' "
(quoting *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2204, 91 L.Ed.2d 49 (1986)); *see also Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62–63 (2d Cir.1992).

Plaintiff has stated causes of action for both types of sexual harassment. For brevity, any reference to "hostile work environment" in this memorandum incorporates both *quid pro quo* and hostile work environment harassment.

dence, then the defendant should have prevailed on its motion for summary judgment.

■ Upon reviewing the record, the court finds the defendants' argument to be totally specious. This conclusion is mandated by the fact that, in deciding *McLaughlin I,* the court did not rely upon affidavits that were submitted merely upon the affiant's information and belief. The court has scrutinized *McLaughlin I,* searching for every reference therein to plaintiff's affidavits. Every allegation cited in *McLaughlin I,* with one inconsequential exception, is based upon the *direct* knowledge of the affiant.[3] *See McLaughlin I,* 739 F.Supp. at 101–03. Not surprisingly (with the one exception mentioned in n. 3), the defendants' memorandum supporting its motion to reargue is devoid of any credible reference to this court's reliance on affidavits submitted "upon information and belief." Although defendants do cite in their briefs to paragraphs of affidavits submitted upon information and belief, there is no doubt that none of those paragraphs were relied upon by this court in deciding *McLaughlin I.*

In light of these incontrovertible facts, the propriety of defendant's motion is highly questionable. It is difficult to fathom how the defendants can argue that *McLaughlin I* was clearly erroneous or otherwise created "manifest injustice" to warrant reconsideration of that decision when there is not a scintilla of fact to support their argument.

Defendants' second ground for requesting leave to reargue concerns this court's ruling that, with respect to defendants' motion to dismiss on statute of limitations grounds, "it is best to permit the parties to go forward with discovery so that any sub-

sequent decision may be made on a more complete factual record." *McLaughlin I,* 739 F.Supp. at 108. Defendants present no new authority or evidence to justify reconsideration. Therefore, defendants are once again left to argue that this court should grant leave to reargue because of the need to correct a clear error in *McLaughlin I,* or to prevent manifest injustice. *Wilson,* 770 F.Supp. at 89.

To review, suits instituted through a state agency (such as the DHR) alleging unlawful discrimination pursuant to 42 U.S.C. §§ 2000e–2 and –3 must be filed with the EEOC within 300 days of the alleged unlawful acts. *McLaughlin I,* 739 F.Supp. at 107 (citing 42 U.S.C. § 2000e–5(c)).[4] Defendants argued in *McLaughlin I* that the plaintiff did not file her EEOC claim within 300 days of the alleged unlawful conduct, and that the only timely claims involve " 'conclusory allegations of wrongdoing unsupported by any factual information.' " *Id.* (citing Union Def.Mem., at 37). As such, defendants argued that plaintiff's claims are time barred.

This court relied upon the "continuing violations doctrine" to reject defendants' argument and find that plaintiff's claim was timely as to all allegations. *Id.* at 107–08. Specifically, the court held that further discovery could allow plaintiff to show a series of related discriminatory and retaliatory acts, at least one of which fell within the limitations period, thus warranting delay of the commencement of the statute of limitations until the last unlawful act occurred. *Id.* (citing *Blesedell v. Mobil Oil,* 708 F.Supp. 1408, 1414–15 (S.D.N.Y. 1989) (discussing Second Circuit standard for application of the continuing violations doctrine)). For the interim (until further discovery is completed), the court held that

---

**3.** The single exception that the court was able to find is one reference to two McLaughlin affidavits: Vol. III of SCR at 18–19, and Feb. 17, 1990 affidavit ¶¶ 16–17. *See McLaughlin I,* 739 F.Supp. at 102. The two affidavits state the same proposition, and are therefore considered "one reference to two affidavits." Considering the overwhelming factual support based upon the personal knowledge of other affiants, the court can safely conclude that the single refer-

ence to these unsupported affidavits was harmless.

**4.** This marks an exception to the regular 180 day statute of limitations for Title VII claims. Under Title VII, if proceedings are instituted through a state agency which is authorized to grant relief, then the statute of limitations for filing with the EEOC is extended to 300 days. 42 U.S.C. § 2000e–5.

plaintiff had made a sufficient showing of the existence of a continuing violation of Title VII to at least temporarily withstand defendants' motion. *Id.* at 108. Due to defendants' current motions, further discovery has still not occurred.

■ The defendants' own arguments help the court resolve this leg of their motion. The defendants implicitly acknowledge that the court's decision to allow discovery to proceed before ruling further on the statute of limitations issue is in accord with the general case authority on this point. *See* Def.Mem. (6/20/90), at 5. In light of the authority, the court's decision to allow discovery to proceed so that a future decision can be made on a more complete factual record, *see McLaughlin I,* 739 F.Supp. at 108, can hardly be deemed "clearly erroneous" or "manifestly unjust." The defendants' reliance on this court's decision in *Dolittle v. Ruffo,* No. 88–CV–1175, 51 Fair Empl.Prac.Cas. (BNA) 1790, 1990 WL 2648 (N.D.N.Y.1990) (McCurn, C.J.), is puzzling because that case clearly stands for the proposition that the court *should* await a fully developed record before rushing to a decision on statute of limitations defenses. *Id.* at *3.

Defendants have failed to convince this court that *McLaughlin I* should be reconsidered. Accordingly, defendants' motion for leave to reargue is denied with prejudice.

### B. Defendants' Motion for Summary Judgment

Defendants' current motion for summary judgment is founded on two premises. First, Title VII provides only for equitable, not compensatory, relief. Second, plaintiff is restricted to litigating her sexual harassment claims only as they relate to the alleged hostile work environment at the QWL Committee. In other words, plaintiff cannot argue that she was wrongfully terminated, and thus cannot seek reinstatement to her former position or back-pay. She is limited to recovering equitable relief for damage she allegedly sustained during her employ with the QWL Committee. The

necessary conclusion, according to the defense, is that plaintiff has no viable remedy available to her as a matter of law, even if liability is proven. The defendants argue that absent an available remedy, plaintiff cannot maintain this action and summary judgment should be granted.

### 1. Retroactivity of Civil Rights Act of 1991

■ After these motions were filed, and two years after plaintiff commenced this suit, Congress enacted the Civil Rights Act of 1991, Pub L. No. 102–166, 105 Stat. 1071 (1991) ("Civil Rights Act" or "Act"). The new Act amends Title VII in a manner which could be fatal to defendants' argument. Specifically, the Act amends Title VII to permit a prevailing plaintiff to recover compensatory and/or punitive damages against a respondent who engaged in intentional discrimination. *Id.* § 102, 105 Stat. 1072 (to be codified at 42 U.S.C. § 1977A).[5] If the damages provisions of the Act are applicable to the present case, then defendant can no longer argue that plaintiff has no viable remedy available to her as a matter of law, and their motion for summary judgment will be defeated.

Of course, the Act will affect this case only if its damages provisions apply retroactively, *i.e.* to cases pending when the Act took effect. The Second Circuit recently had an opportunity to decide whether the Civil Rights Act applies retroactively to cases that were pending on its effective date. The court avoided a ruling, however, because the issue had not been properly briefed and argued. *Song v. Ives Laboratories,* 957 F.2d 1041, 1047–48 (2d Cir.1992). This court must therefore determine whether the damages provisions of the Civil Rights Act apply to cases that were pending when the Act took effect.

#### a. Congressional intent

In determining whether the Act—or any portion of the Act—applies retroactively, the court must be guided initially by Congressional intent. *Kaiser Alum. & Chem.*

---

**5.** *But see* exclusions and limitations, *id.* (none of   which apply to this case).

*Corp. v. Bonjorno* ("*Bonjorno*"), 494 U.S. 827, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990); *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 911 F.2d 1377, 1384 (10th Cir.1990). Congressional intent is determined primarily from the plain language of the statute, and only secondarily from the Act's legislative history. *See DeVargas*, 911 F.2d at 1385–88; *see also, e.g., Bonjorno*, 110 S.Ct. at 1575 & 1577; *Simons v. Southwest Petro–Chem, Inc.*, No. 90–2242–V., 1992 WL 25218, at *3 (D.Kan. Jan. 22, 1992); *Hansel v. Public Serv. Co.*, 778 F.Supp. 1126, 1136 (D.Colo.1991).

The only provision of the Act addressing its effective date appears in section 402(a), Pub.L. No. 102–166, § 402(a), 105 Stat. 1071, 1099 (1991). That section states, in pertinent part:

> IN GENERAL.—Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.

*Id.* Section 402(a) is of no assistance in discovering Congressional intent because it deals only with the Act's effective date. That is to say, § 402(a) does not indicate whether the Act, once effective, should apply to pending cases. *Maddox v. Norwood Clinic*, 783 F.Supp. 582, 584 (N.D.Ala. 1992). Of the more than forty courts having addressed this issue, *none* have held that section 402 is *by itself* conclusive on the issue of retroactivity. Moreover, no other provision of the Civil Rights Act speaks to the Act's retroactive effect. *E.g. Sanders v. Culinary Workers Union Local No. 226*, 783 F.Supp. 531, 537 (D.Nev. 1992); *Burchfield v. Derwinski*, 782 F.Supp. 532, 535 (D.Colo.1992); *Hansel*, 778 F.Supp. at 1136.

A few courts have purported to infer Congressional intent from the language of the Act. Interestingly, those courts have reached widely divergent conclusions on Congressional intent. Two of the courts figured that Congress clearly intended for the Act to have retroactive effect, *see Gra-ham v. Bodine Elec. Co.*, 782 F.Supp. 74, 75–76 (N.D.Ill.1992); *Stender v. Lucky Stores, Inc.*, 780 F.Supp. 1302, 1303–04 (N.D.Cal.1992) (Patel, J.), while a third opined that Congress intended for prospective effect only, *see Van Meter v. Barr*, 778 F.Supp. 83, 85 (D.D.C.1991) (Gesell, J.); *see also Maddox*, 783 F.Supp. at 585 (legislative history shows Congress's intent for prospective effect only). The split in these courts is auspicious. It is difficult to fathom how this court can find that Congressional intent concerning retroactivity is clear when these three respected courts have reached such opposite but plausible conclusions on the issue.

In other situations, Congress has given explicit instructions concerning the retroactive effect of new legislation. *E.g. DeVargas*, 911 F.2d at 1385 & n. 7 (comparing examples of clear Congressional intent); *Thompson*, 783 F.Supp. at 894–96; *West*, 782 F.Supp. at 1134–35 & n. 11; *Burchfield*, 782 F.Supp. at 535. "When Congress wants a statute to apply retroactively, it is quite capable of saying so in plain, unequivocal language." *Maddox*, 783 F.Supp. at 585 (citing examples). In fact, within four weeks of passing the Civil Rights Act, the same Congress amended the Securities Exchange Act of 1934, and spoke in unequivocal terms with respect to the amendment's retroactive effect. *See* Federal Deposit Insurance Corp. Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236, 2387 (1991) (to be codified at 15 U.S.C. § 78aa). Congress's silence on retroactivity in this instance, especially when it has spoken so clearly on the issue in other circumstances, precludes the court from reading legislative intent into the plain language of the Act. *Maddox*, 783 F.Supp. at 585.

Not surprisingly, the overwhelming majority of courts that have visited the issue agree that the plain language of the Act is unclear with regard to Congressional intent.[6] *Poston v. Reliable Drug Stores*, 783

---

**6.** *See, e.g., Thompson v. Johnson & Johnson* *Mgmt. Information Ctr.*, 783 F.Supp. 893, 895

F.Supp. 1166, 1168 (S.D.Ind.1992). The fact that the three courts described above (*Graham, Stender,* and *Van Meter*) needed to draw such broad inferences to reach their conclusions on Congressional intent indicates that Congressional intent is less than clear from the plain language of the statute. This court agrees with the conclusion that since "there is no clear, unambiguous statement [in the Act] as to retroactivity. . . . [a]ny inference or construction one way or the other would be pure speculation." *Khandelwal v. Compuadd Corp.,* 780 F.Supp. 1077, 1079 (E.D.Va.1992).

The court must also agree with the formidable majority of courts holding that Congressional intent cannot be gleaned from the legislative history of the Act, either.[7] To be sure, the legislative history shows that Congress was purposefully ambiguous on the issue of the Act's retroactivity, thus intending to leave the issue for the judiciary to resolve. *E.g. King,* 779 F.Supp. at 157. Congress's evasion of the retroactivity issue was evident from the well-documented discord between the two principal sponsors of the Act, Senators Kennedy and Danforth. Their dispute has been neatly condensed into the following description:

A review of the legislative history confirms that Congress was anything but clear on whether the Act would apply to pending cases. The main Senate sponsors of the Act, Senators Danforth and Kennedy, issued a joint "interpretive memorandum" in which they agreed on every issue except retroactivity. 137 Cong.Rec. S15483 (Oct. 30, 1991). The republican senators lined up behind Senator Danforth, asserting that the Act was not intended to be retroactive. The democratic senators lined up behind Senator Kennedy, asserting that the Act was intended to be retroactive. 137 Cong.Rec. S15485 (Oct. 30, 1991). The legislative history from the House is similar with the republicans saying the Act is not retroactive and the democrats asserting the opposite. *See, e.g.,* 137 Cong.Rec. H9530–31, H9548, and H9549 (Nov. 7, 1991).

*Hansel,* 778 F.Supp. at 1136–37. *Accord, e.g., Sanders,* 783 F.Supp. at 538; *Joyner,* 784 F.Supp. at 876–78; *Doe,* 783 F.Supp. at 1383 ("as a result of the strong debate in Congress, the 1991 Act's legislative history contains contradictory statements from its sponsors"). *See also Maddox,* 783 F.Supp. at 585 ("one can find what seems to be an equal number of opinions supporting both prospective and retroactive application of the Act").

After inconclusive debate, Senators Danforth and Kennedy separately conceded that Congress could not agree on the retroactivity issue, and that the courts would ultimately have to resolve that issue. *Burchfield,* 782 F.Supp. at 536 (quoting Sen. Kennedy's statement that "[i]t will be up to the courts to determine the extent to which the bill will apply to cases and claims

(D.N.J.1992); *Sanders,* 783 F.Supp. at 537; *Maddox,* 783 F.Supp. at 584; *Joyner v. Monier Roof Tile, Inc.,* 784 F.Supp. 872, 875–76 (S.D.Fla. 1992); *West v. Pelican Mgmt. Serv. Corp.,* 782 F.Supp. 1132, 1134–35 (M.D.La.1992); *Burchfield,* 782 F.Supp. at 535; *Simons,* 1992 WL 25218, at *3; *Guess v. City of Portage,* No. H–90–276, 1992 WL 8722 (N.D.Ind. Jan. 14, 1992); *Mojica v. Gannett Co., Inc.,* 779 F.Supp. 94, 97 (N.D.Ill.1991); *Hansel,* 778 F.Supp. at 1136.

7. *See, e.g., Thompson,* 783 F.Supp. at 894–96; *Sanders,* 783 F.Supp. at 538; *Joyner,* 784 F.Supp. at 876–78; *West,* 782 F.Supp. at 1136; *Doe v.*

*Board of County Commissioners,* 783 F.Supp. 1379, 1383 (S.D.Fla.1992); *Burchfield,* 782 F.Supp. at 536; *Simons,* 1992 WL 25218, at *3; *Bistrow v. Drake Street, Inc.,* No. 87–C–4412, 1992 WL 14262, at *1 (N.D.Ill. Jan. 21, 1992); *Goldsmith v. City of Atmore,* 782 F.Supp. 106 (S.D.Ala.1992); *Guess,* 1992 WL 8722, at *2; *King v. Shelby Medical Center,* 779 F.Supp. 157, 158 (N.D.Ala.1991); *Mojica,* 779 F.Supp. at 97; *Hansel,* 778 F.Supp. at 1136. *But see Maddox,* 783 F.Supp. at 585 (finding that legislative history shows that Congress did not intend for Act to apply retroactively).

that are pending on the date of enactment", 137 Cong.Rec. S15485); *Joyner*, 784 F.Supp. at 876–78 (citing Sen. Danforth's statement to same effect, 137 Cong.Rec. S15325 (Oct. 29, 1991) and S15483 (Oct. 30, 1991)). Indeed, Congress's abandonment of the retroactivity debate, and its decision to defer to the courts' interpretation, was likely a political compromise that was necessary to assure passage of the controversial Act. *Maddox*, 783 F.Supp. at 585.

### b. *Presumption in the absence of Congressional intent*

The net effect of the Act's ambiguous language and history is that Congress's intent regarding retroactivity of the Act cannot be discerned. Unfortunately, the course which the court must follow in the absence of a clear indication of Congressional intent is mired in a state of total confusion, and is the subject of widespread legal debate. The confusion arises from the fact that there are two irreconcilable lines of authority addressing how a court should proceed when Congressional intent on retroactivity is unclear.

The first line of cases is based upon the 1974 Supreme Court decision in *Bradley v. Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In *Bradley*, the Court faced the issue of whether a recently-enacted statute permitting recovery of attorney's fees should apply to a case that was pending appeal when the statute took effect. Relying in part upon *United States v. Schooner Peggy*, 5 U.S. (1 Cranch 103), 2 L.Ed. 49 (1801) (Marshall, C.J.), the Court held that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice...." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. Thus, the Court ruled that the fee recovery statute should apply retroactively to cases that were pending when the statute took effect.

The Court's apparently clear ruling in *Bradley* on retroactivity was jolted by statements in subsequent decisions, most notably in *Bowen v. Georgetown University Hosp.* ("*Georgetown Hospital*"), 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). *See also Bennett v. New Jersey*, 470 U.S. 632, 636, 105 S.Ct. 1555, 1558, 84 L.Ed.2d 572 (1985); *United States v. Security Indus. Bank*, 459 U.S. 70, 79 & 80, 103 S.Ct. 407, 412 & 413, 74 L.Ed.2d 235 (1982). Although retroactive application of a Congressional enactment was not at issue in *Georgetown Hospital*, the Court nonetheless offered the following observation in *dicta:*

Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.

*Georgetown Hospital*, 488 U.S. at 208, 109 S.Ct. at 471 (citing, *e.g.*, *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Claridge Apartments Co. v. Commissioner*, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944)).

This court is not the first to note the dichotomy between *Bradley* and *Georgetown Hospital*. In fact, in 1990 the Supreme Court acknowledged the "apparent tension" between its two statements. *Bonjorno*, 110 S.Ct. at 1577. The Court in *Bonjorno* did not have to reconcile the *Bradley/Georgetown Hospital* conflict, however, because the Court found that Congressional intent regarding retroactivity in that particular case was clear. *Id.* Nevertheless, Justice Scalia issued a concurring opinion in *Bonjorno*, in which he wrote that "these two lines of cases are not merely, as the Court confesses, in 'apparent tension'; they are in irreconcilable contradiction and have spawned Courts of Appeals opinions to match." *Id.* at 1579 (Scalia, J., concurring) (urging majority to abandon *Bradley* presumption of retroactivity).

To be sure, the Courts of Appeals have split on the question of whether to follow *Georgetown Hospital*'s presumption of no retroactivity or *Bradley's* presumption of retroactivity. *Compare Simmons v. Lockhart*, 931 F.2d 1226, 1230 (8th Cir.1991) ("The better view is that of *Georgetown Hospital;* we will not retroactively apply statutes or regulations without a clear indi-

cation that the legislative or administrative agency intends to diverge from the norm of acting prospectively"); *Leland v. Federal Ins. Adm'r*, 934 F.2d 524, 527–28 & n. 7 (4th Cir.1991) (adopting *Georgetown Hospital* and rejecting *Bradley* ); *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 963–63 n. 6 (D.C.Cir.1990) (Thomas, J.) (same); *Sargisson v. United States*, 913 F.2d 918, 923 (Fed.Cir.1990); *DeVargas*, 911 F.2d at 1390–92 (10th Cir.1990) (same); *Davis v. Omitowoju*, 883 F.2d 1155, 1170 (3d Cir.1989) (same) *with United States v. Peppertree Apartments*, 942 F.2d 1555, 1561 n. 3 (11th Cir.1991) (court is bound by precedent to apply *Bradley* presumption); *Federal Deposit Ins. Corp. v. Wright*, 942 F.2d 1089, 1095 n. 6 (7th Cir.1991) (same); *United States v. R.W. Myer, Inc.*, 889 F.2d 1497, 1505 (6th Cir.1989). Furthermore, the Second Circuit has not directly addressed the *Bradley/Georgetown Hospital* dilemma, thus leaving the court with no clear guidance as to how to resolve this split in authority. *But see infra* p. 972 (Second Circuit has addressed retroactivity in the limited realm of "restorative legislation").

After reviewing the arguments and case law favoring each presumption, this court concludes that the *Georgetown Hospital* presumption against retroactivity is more appropriate—at least with respect to the damages provisions of the Civil Rights Act—and thus adopts it as the rule of this court. In so ruling, the court is swayed by the fact that every Court of Appeals to have truly confronted the merits of the presumption debate has concluded that *Georgetown Hospital* represents the more suitable resolution to the retroactivity issue. *See Simmons*, 931 F.2d at 1230; *Wilson v. United States*, 917 F.2d 529, 537 (Fed.Cir.1990); *Alpo Petfoods, Inc.*, 913 F.2d at 963–64 n. 6; *DeVargas*, 911 F.2d at 1390–92; *Criger v. Becton*, 902 F.2d 1348, 1353–54 (8th Cir.1990). On the other hand, the courts that persist with the *Bradley* presumption have done so summarily, by mere default to their own pre-*Georgetown Hospital* precedent. *See Peppertree Apartments*, 942 F.2d at 1561 n. 3; *Wright*, 942 F.2d at 1095 & n. 6; *R.W.*

*Myer, Inc.*, 889 F.2d at 1505. The Eleventh Circuit arguably provided the most vivid example of this blind adherence to its own precedent when it acknowledged, "[t]his circuit has relied upon *Bradley* analysis to determine the retroactive application of statutory changes.... Thus, unless otherwise directed by the Supreme Court or the Eleventh Circuit en banc, we are bound by precedent to apply the *Bradley* analysis." *Peppertree Apartments*, 942 F.2d at 1555 n. 3 (citation omitted).

This court is not willing to adopt *Bradley* simply by default, especially when the rationale against retroactivity is so convincing. The presumption against retroactive application of legislation is grounded in more than 150 years of Supreme Court precedent; *Bradley*, by contrast, marked a brief and inexplicable excursion from the long-standing norm. *DeVargas*, 911 F.2d at 1390–92 (citing *Bonjorno*, 110 S.Ct. at 1579–81 (Scalia, J., concurring). In 1990, then-Circuit Judge Clarence Thomas, in rejecting the *Bradley* presumption, wrote on behalf of the D.C. Circuit that "[b]ecause the *Georgetown Hospital* rule seems more faithful to the older decisions that are interpreted in the retroactivity debate, ... we rely on that rule here." *Alpo Petfoods, Inc.*, 913 F.2d at 963–64 n. 6. The Supreme Court validated this view in 1982, when it noted that "[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *Security Indus. Bank*, 459 U.S. at 79 & 80, 103 S.Ct. at 412 & 413. Justice Scalia's *Bonjorno* concurrence has been frequently cited for its lengthy interpretation of why the *Bradley* presumption is at odds with the Court's historical disapproval of retroactive application. *See Bonjorno*, 110 S.Ct. at 1579–82 (Scalia, J., concurring), *cited in, e.g., DeVargas*, 911 F.2d at 1390; *Khandelwal*, 780 F.Supp. at 1080.

The court is also mindful of the fact that the Supreme Court has not been altogether silent in the *Bradley/Georgetown Hospital* debate. While it did not resolve the conflict in its 1990 *Bonjorno* decision, the Court somewhat forecast its view of the

situation when it described *Georgetown Hospital* as its "recent reaffirmation of the generally accepted axiom" that retroactivity is not favored in the law. *Bonjorno,* 110 S.Ct. at 1577. One district court that encountered the retroactivity issue in the context of the Civil Rights Act candidly acknowledged that its reliance on *Georgetown Hospital* was due in large part to the fact that "*Georgetown [Hospital]* is the more recent case which most likely reflects the position of the current Supreme Court." *Tyree v. Riley,* 783 F.Supp. 877, 892 (D.N.J.1992). Indeed, *Bradley* was decided nearly twenty years ago; *Georgetown Hospital* was decided just four years ago, in 1988.

Prospective application of statutes fits more cleanly into the constitutional scheme of separation of powers than does retroactive application, thus giving further credence to the view that the presumption of retroactive application of statutes is disfavored in the law. The Eighth Circuit recently relied upon this rationale when it concluded:

> The better rule is that of *Georgetown Hospital:* we will not retroactively apply statutes or regulations without a clear indication that the legislative or administrative agency intends to diverge from the norm of acting prospectively.... [T]he presumption against retroactive application best preserves the distinction between courts and legislatures: the former usually act retrospectively, settling disputes between persons, the latter usually act prospectively, *setting the general rules for future conduct.*

*Simmons,* 931 F.2d at 1230 (citing *American Trucking Ass'ns v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2343–45, 110 L.Ed.2d 148 (Scalia, J., concurring)) (emphasis added). This court similarly relies in part upon the Constitution's separation of powers design and policy to substantiate its ruling that statutes should be presumed to carry prospective effect only, unless otherwise clearly indicated by Congress.

Some courts have suggested that the Civil Rights Act should apply to cases that were pending during its enactment because "restorative legislation should be applied retroactively." *Stender,* 780 F.Supp. at 1305. To be sure, the Second Circuit espouses the view that when Congress acts to "clarify" a Supreme Court decision, thereby restoring the law to its previous posture, then the enactment should be applied retroactively. *Leake v. Long Island Jewish Center,* 869 F.2d 130, 131 (2d Cir. 1989), *aff'g* 695 F.Supp. 1414, 1417 (E.D.N.Y.1988); *Mrs. W. v. Tirozzi,* 832 F.2d 748 (2d Cir.1987). The court in *Stender* held that the Civil Rights Act should be applied to cases that were pending upon its enactment in part because the Act reversed or modified a number of Supreme Court decisions, and hence was restorative in nature and deserving of retroactive effect. *Stender,* 780 F.Supp. at 1078. *But see Maddox,* 783 F.Supp. at 586 (rejecting *Stender* argument because the Act is not completely restorative in nature).

Without questioning the validity of the *Stender* assessment, this court finds that the restorative legislation theory justifying retroactivity is inapposite to cases such as the present. The theory cannot apply here because the Act provision at issue involves Congress's *new* allowance under Title VII for recovery of compensatory and punitive damages. As will be discussed in greater detail below, *see infra* p. 974, until passage of the Act, Title VII expressly limited recovery to equitable relief, and precluded recovery of compensatory and punitive damages. *E.g. Carrero v. New York City Housing Auth.,* 890 F.2d 569, 581 (2d Cir. 1989) (citing *Shah v. Mt. Zion Hosp.,* 642 F.2d 268, 272 (9th Cir.1981) ("neither compensatory nor punitive damages are recoverable under Title VII")). In other words, the new damages provisions of the Act were not promulgated in response to a Supreme Court decision. Therefore, while it is true that the Civil Rights Act served in part to legislatively overturn various Supreme Court decisions, *see* Civil Rights Act, Pub.L. No. 102–166, § 3(4), 105 Stat. 1071, 1071 ("Purposes"), the Act certainly did not have a restorative effect *vis-a-vis* recovery of monetary damages. Thus, the *Stender*

rationale for applying the Act to pending cases because it is restorative legislation is inapplicable to cases such as the present, in which a plaintiff seeks retroactive application of Title VII's brand new allowance of damages.

Equally unpersuasive is the argument that the Act should apply retroactively because it makes procedural, not substantive, changes to Title VII. *See Leake,* 695 F.Supp. at 1417. Under this reasoning, modifications which are only procedural in nature should be presumed to take effect retroactively because they do not affect rights *per se,* but rather only modify the means by which a plaintiff may vindicate his already protected interests. *See Leake,* 695 F.Supp. at 1414.

Cases extolling the procedural/substantive classification must also be distinguished, because the statutory right to recover compensatory damages from a defendant is a substantive right. *Van Meter,* 778 F.Supp. at 84. More particularly, the Civil Rights Act provision allowing recovery of damages under Title VII marks a substantive change to the Act, not merely a change to the procedures by which cases under Title VII should proceed. *See id.* As a substantive right, the new damages allowance would be unaffected by a proposal to apply mere procedural changes retroactively. For this court to allow otherwise would amount to changing the rules after the game has begun, something the Supreme Court has emphatically refused to do. *See Leake,* 695 F.Supp. at 1417 (construing *Bennett,* 470 U.S. at 636, 105 S.Ct. at 1558; *see also United States v. Fernandez–Toledo,* 749 F.2d 703, 705 (11th Cir. 1985). In sum, even under the procedural/substantive theory for determining the presumption of retroactivity, cases pending when the Civil Rights Act took effect remain unaffected by the Act's new substantive provisions for damages.

Finally, in deciding to adopt the presumption against retroactive effect of statutes, the court considers the "practical considerations" of presuming retroactive effect of the Act, *see Bennett,* 470 U.S. at 638, 105 S.Ct. at 1559, and wonders whether retro-active application would create "an administrative nightmare." *Cf. Criger,* 902 F.2d at 1354. One cannot help but think that if Congress truly wanted the new Act to affect pending cases, it would have specifically provided for that unusual and somewhat burdensome result. *Cf. DeVargas,* 911 F.2d at 1385 & n. 7 (citing statutes in which Congress clearly stated an intent for retroactive application); *Thompson,* 783 F.Supp. at 894–96; *West,* 782 F.Supp. at 1134–35 & n. 11; *Burchfield,* 782 F.Supp. at 535. Congress's failure to do so leaves the court to presume that the Act does not apply retroactively. *See Maddox,* 783 F.Supp. at 585.

To summarize, this court's adoption of the *Georgetown Hospital* presumption against retroactive application of statutes means that, absent clear Congressional intent to the contrary, the Civil Rights Act— or at least the Act's provision for recovery of compensatory and punitive damages under Title VII—does not apply to cases that were pending on the Act's effective date. As discussed above, *see supra* pp. 967–70, the court concludes that the Act displays no credible sign of Congressional intent for retroactive application. Accordingly, plaintiff cannot rely upon the damages provisions of the new Civil Rights Act in her efforts to withstand defendants' motion for summary judgment.

2. Availability of a remedy under the former Title VII

■ The "case or controversy" requirement of article III of the United States Constitution dictates that a plaintiff cannot maintain a suit in which no relief can be granted. *See, e.g., Ashcroft v. Mattis,* 431 U.S. 171, 172, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219 (1977) ("[e]motional involvement in a lawsuit is not enough to meet the case-or-controversy requirement"; plaintiff must have an available remedy). "[A] plaintiff's desire for psychological vindication, however deeply felt, cannot keep alive a case that is otherwise moot." *Bohen v. City of East Chicago,* 622 F.Supp. 1234, 1245 (N.D.Ind.1985), *aff'd in part, rev'd in part,* 799 F.2d 1180 (7th Cir.1986) (citing,

*e.g., Ashcroft,* 431 U.S. at 172, 97 S.Ct. at 1740; *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–05, 103 S.Ct. 1660, 1664–66, 75 L.Ed.2d 675 (1983)). Therefore, in analyzing defendants' motion, the court must examine exactly what remedies, if any, are available to this plaintiff under Title VII. If no remedies are available, then defendants are entitled to summary judgment.

■ The Title VII remedial provision applicable to this case states, in pertinent part:

**(g) Injunctions; affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders.** If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring employees, with or without back pay ..., or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g) (1988). This statute has been consistently interpreted as permitting only equitable relief for prevailing plaintiffs. Neither compensatory nor punitive damages are recoverable under Title VII. *E.g. Carrero,* 890 F.2d at 581 (citing *Shah,* 642 F.2d at 272); *Bohen v. City of East Chicago,* 799 F.2d 1180, 1184 (7th Cir.1986).

The statute lists four possible remedies for prevailing parties: enjoinder of future conduct, reinstatement, award of back pay, and "any other equitable relief as the court deems appropriate." *See* § 2000e–5(g). As a practical matter, two of the four possible equitable remedies listed in Title VII—reinstatement and award of back pay—would be applicable only to wrongful discharge claims in which the plaintiff was denied employment and/or pay. *See* 42 U.S.C. § 2000e–5(g). As such, these remedies are not available to the plaintiff here because she cannot recover on the issue of her termination from employment. *See su-*

*pra* p. 965 (plaintiff is collaterally estopped from litigating wrongful termination). A third remedy listed—enjoinder of future sexual harassment—is arguably inapplicable as moot because plaintiff is no longer employed by the QWL Committee, and the QWL Committee folded in 1988. *McLaughlin I,* 739 F.Supp. at 102. Only the fourth remedy, which allows the court to award "any other *equitable* relief as the court deems appropriate" (emphasis added), is arguably applicable here. Hence, the pertinent inquiry boils down to whether the court is able to frame an equitable remedy for plaintiff's alleged injuries.

■ The defense argues that no such remedy exists, and therefore summary judgment is warranted. Indeed, it seems difficult to comprehend any sort of equitable relief that might still be available to plaintiff for her hostile work environment claim, considering that she is no longer employed by the QWL Committee and the Committee folded in 1988. Still, plaintiff has suggested five equitable remedies that remain available to her under Title VII:

(1) expungement of her employment record;

(2) reinstatement of forty-three days of "sick leave" that plaintiff took as a consequence of defendants' harassment of her;

(3) enjoinder of defendants from the continued "blacklisting" of her;

(4) nominal damages; and

(5) reasonable attorney's fees.

As discussed below, only the first and second purported remedies (expungement of record and reinstatement of sick leave) might be available to plaintiff, and the extent to which those remedies are available to this plaintiff cannot be ascertained until limited discovery is conducted. Therefore, for the reasons discussed below, the defendants' motion for summary judgment is denied without prejudice to renew, pending limited discovery on the availability of these remedies to this particular plaintiff.

### a. Available remedies

#### (1) Expungement of work record

Plaintiff submits that the court could (and should) order that her work record be expunged, reasoning:

> Plaintiff has alleged in her complaint that Defendant's harassment of her often took the form of an attempted destruction of Plaintiff's work record. Various unfounded written complaints were made against Plaintiff. An unfounded investigation of Plaintiff's work performance was conducted by Defendant Gibbs. Memos were placed in Plaintiff's employment file which were placed there in retaliation for Plaintiff filing her complaint with the State Division of Human Rights.

> If plaintiff prevails, the Court could direct that all of these documents which have been placed in Plaintiff's employment record should be removed and destroyed. This type of remedy for a Title VII violation has been deemed proper.

Pl.Mem. (12/18/90), at 7–8.

Courts having addressed this issue have unambiguously ruled that purging personnel records qualifies as equitable relief recoverable under Title VII. *E.g. Hale v. Marsh*, 808 F.2d 616, 620 (7th Cir.1986); *Smith v. Sec. of Navy*, 659 F.2d 1113, 1114, 1120 n. 57 & 1122 (D.C.Cir.1981); *Greer v. University of Arkansas*, 544 F.Supp. 1085, 1103 (E.D.Ark.1982), *aff'd in part, rev. in part*, 719 F.2d 950 (8th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 552 (1984); *Croushorn v. Board of Trustees*, 518 F.Supp. 9, 29 (M.D.Tenn. 1980); *Dual v. Griffin*, 446 F.Supp. 791, 801 (D.D.C.1977). In one Title VII sexual discrimination suit, the District of Minnesota observed that "[e]xpungement is necessary both to eliminate the discriminatory effects of past retaliation and to preclude any future discriminatory effects" of past retaliation. *Mead v. U.S. Fidelity & Guaranty Co.*, 442 F.Supp. 114, 136 (D.Minn. 1977). The Second Circuit has apparently not yet visited the issue.

■ In light of the established rule that district courts have very broad equitable power to fashion remedies under Title VII, *see Arizona Governing Cmte. v. Norris*, 463 U.S. 1073, 1091–93, 103 S.Ct. 3492, 3502–04, 77 L.Ed.2d 1236 (1983); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–21, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975), and the strong precedent supporting expungement as an equitable remedy, the court finds that expungement of personnel records is *generally* an available equitable remedy under Title VII. Whether expungement is available in this particular case will be discussed *infra* p. 976.

#### (2) Reinstatement of lost sick leave

Plaintiff alleges that between December, 1987 and May, 1988, she was forced to utilize forty-three of her sick leave days as a direct result of the stress and emotional trauma created by the unlawful hostile working conditions created by Defendants. The effect of these lost days is two-fold. According to the plaintiff, "[a]lthough plaintiff, in her affidavit, makes reference to the fact that the loss of sick leave days could have some impact on her future retirement benefits, the main thrust of plaintiff's affidavit is that as a direct result of defendants' unlawful behavior, she was forced to use 43 sick leave days which she otherwise would not have had to use." Pl. Mem. (12/31/91) at 3. Plaintiff therefore asks the court to order the defendants to restore the sick leave days she expended as a result of the alleged harassment.

■ Like expungement of work records, restoration of lost sick leave is a remedy generally cognizable under Title VII. *Dual*, 446 F.Supp. at 801–02 (ordering expungement of work records *and* restoration of lost sick leave). In *Dual*, the court found that the defendant retaliated against and otherwise harassed the plaintiff in violation of Title VII, and that the retaliation and harassment caused plaintiff to suffer extreme stress and incumbent health difficulties. Plaintiff was consequently hospitalized on three occasions, resulting in the exhaustion of all of her sick leave. After detailing these facts, the court ruled that "[t]hese particular circumstances justify an order restoring leave

used by plaintiff during his three hospitalizations and other periods...." *Id.* at 802.

The holding of *Dual* is directly applicable to this case. Restoration of lost time, which is akin to restoration of lost backpay, is equitable relief under Title VII. *See id.* Not surprisingly, defendants do not contend that restoration of sick leave is other than equitable relief.[8] Accordingly, the court is generally empowered to award a prevailing plaintiff an order restoring her lost sick leave.

Unfortunately, the general proposition that expungement of work records and restoration of lost sick leave are cognizable remedies does not settle the issue in the present case. A problem arises because it is unclear from plaintiff's argument as to *which* of the defendants should be ordered to expunge her work record or reinstate her sick leave. The answer to the court's query presumably depends upon who among the defendants is in possession and control of the allegedly disparaging records, and who is empowered to restore lost sick leave. The question is especially pressing in a case such as the present because, due to the QWL Committee's defunct status, some of the individual defendants are no longer employed by the State. Plaintiff's purported remedies, even though available, simply would not apply to those defendants who are not in a position to modify her work records or reinstate lost sick leave time. Therefore, even if the court accepts plaintiff's argument (as it does), these remedies alone would not help plaintiff withstand *all* defendants' motions for summary judgment; the argument would apply to defeat the motions of only those defendants who are in possession and control of plaintiff's work records.

For the sake of clarity, the foregoing discussion will be summarized in a short syllogism. Each individual defendant in this case is moving for summary judgment. Plaintiff can withstand any given defen-

dant's motion for summary judgment only if (1) a remedy is available to plaintiff, and (2) the given defendant is capable of contributing to that remedy. Expungement of work records and restoration of lost sick leave are the only remedies available to this plaintiff. *See* discussion *infra* pp. 976–80 (why plaintiff's other purported remedies are unavailable in this case). Therefore, plaintiff cannot withstand a given defendant's motion for summary judgment unless she can establish that the given defendant is capable of either expunging plaintiff's work records or restoring her lost sick leave. The court is left to resolve the question of *which* defendants are capable of affording the available relief.

The court rules that plaintiff is allowed to conduct limited discovery to determine which defendants are capable of affording available relief. This limited discovery will last for 120 days. After 120 days, the defendants who are not implicated in the discovery, *i.e.* those without authority to expunge records and/or restore lost sick leave, may renew their motions for summary judgment. Accordingly, defendants' motion for summary judgment is denied without prejudice, pending completion of discovery into the limited issue of which defendants, if any, have authority to expunge plaintiff's work records and restore her expended sick leave.

*b.  Plaintiff's other purported remedies, and why they are unavailable*

It is significant that defendants' motion for summary judgment is denied without prejudice, pending completion of the limited discovery just discussed. The motion is denied without prejudice because none of the *other* remedies suggested by the plaintiff are available to her in her Title VII suit. That is to say, if plaintiff cannot prevail on either of the two remedies discussed above for a given defendant, then

---

**8.** Rather, the State argues that restoration of sick leave should not be allowed here because her use thereof would be too speculative upon which to base relief. This argument is without merit. The only question currently before the court is whether certain equitable relief *is avail-* *able,* so as to allow plaintiff to continue in this lawsuit. Restoration of sick leave is relief which is generally available in Title VII suits. Whether the damages are too speculative is a factual inquiry which may be raised at trial.

there is no remedy available to plaintiff under Title VII. Plaintiff's other purported remedies, and the reasons why they are unavailable in this case, are discussed *seriatim.*

(3) Enjoin defendants from the continued "blacklisting" of plaintiff

Plaintiff asserts that a third remedy available under Title VII is an injunction against the defendants from uttering any further negative references to her. According to plaintiff:

Plaintiff has alleged that after she was terminated from her job with the QWL Committee the Defendants wilfully refused to offer her other positions within the Council 82 or the Governor's Office of Employee Relations, and continued to "Blacklist" her from obtaining other sought after jobs within New York State. If plaintiff prevails, the Court could certainly issue an injunction enjoining Defendants from the continuation of their "blacklisting."

In addition, the Court could award Plaintiff monetary damages resulting from such continued retaliation. Even if Plaintiff's termination of employment by the QWL Committee was the "result of good faith bargaining," this is certainly no license for Defendants to unlawfully retaliate against Plaintiff following her separation from the QWL Committee. As previously stated by Plaintiff, Defendants continue to engage in an intentional effort to deny her career progress in State service. Such actions have a real and economic impact on Plaintiff.

Pl.Mem. (12/18/90), at 9.

▮ Plaintiff essentially suggests that the court could prospectively enjoin the defendants from speaking about her in a derogatory manner. Plaintiff cites only one case in which this remedy has actually been ordered. *See Equal Employment Opportunity Comm'n v. Fotios,* 42 Fair Empl. Prac. Cas. (BNA) 1640, 1987 WL 4781 (W.D.Tex.1987), *noted in Equal Employment Opportunity Comm'n v. Fotios,* 671 F.Supp. 454, 465 (W.D.Tex.1987). In *Fotios,* the Western District of Texas issued,

in a statement devoid of any authority whatsoever, a blanket order which "permanently enjoined [the defendants] from giving negative references to any person or company, including prospective employers, regarding the affected class members." *Fotios,* 671 F.Supp. at 454.

*Fotios* notwithstanding, the court would encounter an insurmountable constitutional barrier to enforcing plaintiff's proposed remedy. Plaintiff is suggesting that Title VII authorizes the court to impose a prior restraint on defendants' speech. In so arguing, plaintiff asks the court ignore the overwhelming precedent militating against imposition of such "gag orders." *See, e.g., Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In *In re Providence Journal Co.,* the First Circuit observed, albeit in the context of restraint on news media, that

the principal purpose of the First Amendment's guaranty is to prevent prior restraints. The Supreme Court has declared: "Any prior restraint on expression comes to this court with a 'heavy presumption' against its constitutional validity." ...

. . . .

*In its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech.* 820 F.2d 1342 (1st Cir.1986) (emphasis added).

Plaintiff may contend that the compelling circumstances of her case are such that a prior restraint on defendants' speech is warranted here. In this court's view, however, any damage the plaintiff might suffer in the absence of a prior restraint pales when compared to the damages the Supreme Court has considered in rejecting other requests for prior restraints. *Cf., e.g., Nebraska Press Assoc.,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (rejecting prior restraint issued to ensure protection of criminal defendant's Sixth Amendment right to a fair trial); *New York Times,* 403

U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (even during wartime, newspapers cannot be restrained from publishing papers that had been classified as "Top Secret" and obtained without authorization). The Supreme Court has consistently directed that prior restraints are wholly impermissible when a sufficient after-the-fact remedy exists to correct any harm that might occur.

This court could not possibly design an order that would be concise enough to avoid chilling defendants' protected speech relating to the plaintiff. The fact that a sufficient after-the-fact remedy, in the form of a defamation suit, would be available to redress future "blacklisting" prevents this court from awarding plaintiff's request for an enjoinder of defendants' future speech. *See Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir.1990); *Community for Creative Non–Violence v. Pierce*, 814 F.2d 663, 672 (D.C.Cir.1987); *Herink v. Harper & Row Publishers, Inc.*, 607 F.Supp. 657, 660 (S.D.N.Y.1985). As the First Circuit wrote in *Providence Journal:*

> If a publisher is to print a libelous, defamatory, or injurious story, an appropriate remedy, though not always totally effective, lies not in an injunction against the publication but in damages or criminal action *after* publication. Although the threat of damages or criminal action may chill speech, a prior restraint "freezes" speech before the audience has the opportunity to hear the message. Additionally, a court asked to issue a prior restraint must judge the challenged speech in the abstract.

820 F.2d at 1345–46 (emphasis in original) (footnote omitted). Absent more convincing authority to the contrary, this court is not prepared to hold that plaintiff could recover an injunction against defendants' future speech if she prevails in her Title VII claim.

(4) Award nominal damages

■ Plaintiff suggests that she can recover nominal damages for the injuries she sustained while being sexually harassed at the QWL Committee, because nominal damages constitute "other equitable relief" under Title VII. 42 U.S.C. § 2000e–5(g) (1988). The defense adamantly contends that nominal damages are not an available remedy under Title VII, because nominal damages constitute compensatory—and not equitable—relief. This court must determine whether nominal damages are recoverable as "other equitable relief" under Title VII. Neither the Supreme Court nor the Second Circuit has directly spoken on this issue.

By this court's count, six different Circuit Courts of Appeals have addressed the question of whether nominal damages are recoverable under Title VII. Of those six, five have stated that nominal damages may be awarded under Title VII. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988); *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986); *Katz v. Dole*, 709 F.2d 251, 253 n. 1 (4th Cir.1983); *Dean v. Civiletti*, 670 F.2d 99, 101 (8th Cir.1982); *Joshi v. Florida State Univ.*, 646 F.2d 981, 991 n. 33 (5th Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2233, 72 L.Ed.2d 845.[9] Unfortunately, each of these courts merely assumed in passing, without explanation, that nominal damages are an available remedy under Title VII.

The Seventh Circuit is the lone court to examine in any detail the "character" of

---

**9.** In *Joshi,* the Fifth Circuit remanded to the trial court for consideration of whether the plaintiff "might be entitled to other relief, if only nominal damages, which would carry with it attorneys fees." *Joshi,* 646 F.2d at 991 n. 33. The court cited the Second Circuit decision in *Gillin v. Federal Paper Board Co.,* 479 F.2d 97 (2d Cir.1973), to support its proposition.

A review of *Gillin,* also a Title VII case, shows that the Second Circuit did *not* suggest that nominal damages would be available to that plaintiff. To the contrary, the Second Circuit actually wrote in *dicta* that "it is difficult to determine the basis for compensatory damages here." *Gillin,* 479 F.2d at 103. Thus, it appears to this court that, in *Joshi,* the Fifth Circuit cited *Gillin* for the simple proposition that remand for a determination of damages is generally an appropriate step for a court of appeals in a Title VII case.

nominal damages.[10] That court has repeatedly held that nominal damages are compensatory in nature, and hence cannot be recovered under Title VII. *Trautvetter v. Quick,* 916 F.2d 1140, 1147–48 (7th Cir. 1990); *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990); *King v. Board of Regents,* 898 F.2d 533, 537 (7th Cir.1990); *Swanson v. Elmhurst Chrysler Plymouth, Inc.,* 882 F.2d 1235, 1240 (7th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423 (7th Cir.1989); *Gray v. Dane County,* 854 F.2d 179, 181 (7th Cir.1988); *Hale,* 808 F.2d at 620. The Seventh Circuit first announced its conclusion in *Bohen v. City of East Chicago,* 799 F.2d 1180, 1184 (7th Cir.1986), when it adopted the district court's holding that a harassed employee may not obtain nominal damages under Title VII. After acknowledging that "[a] number of courts ... have held that a harassed employee may obtain 'nominal damages' under Title VII," the district court (Easterbrook, J., sitting by designation) wrote:

> Nominal damages are not "equitable relief" within the meaning of Title VII. The statute does not mention them, and I could not award them without offering the defendants a jury trial. Too, "nominal" damages are not something a court awards just to keep a case alive. The traditional award of one dollar is the remedy in a case in which compensatory relief is available in principle, but plaintiff did not establish the amount of injury and so cannot obtain a substantial award. Substantial injury yields a substantial award, nominal injury a nominal award. A judge who lacks the power to

award substantial damages that have been proved ... may not use nominal damages as heart balm. The reasons that block an award of actual damages also block an award of nominal damages.

*Bohen,* 622 F.Supp. at 1245–46, *aff'd in part, rev'd in part,* 799 F.2d 1180 (7th Cir.1986) (citations omitted).[11] Under the Seventh Circuit's interpretation, nominal damages are merely a type of compensatory damages, not recoverable under Title VII. *See Bohen,* 799 F.2d at 1184. This court adopts the *Bohen* view because there is no indication in Title VII (or elsewhere) to justify the view that an award of nominal damages should be considered equitable, and not compensatory, relief. Nominal damages are *de minimis* compensatory damages, available only to a plaintiff who has proven liability and is entitled to compensatory relief, but has not proven that a larger award of damages is warranted in that particular case.

Since *Bohen,* the Seventh Circuit has at least twice visited circumstances remarkably similar to those now before this court. In both *Hale v. Marsh,* 808 F.2d at 620, and *Gray v. Dane County,* 854 F.2d at 181, a plaintiff who was precluded from litigating wrongful termination under Title VII nonetheless sought damages for injuries incurred while still in the defendants' employ. *See also Swanson,* 882 F.2d 1235. On both occasions, the court repeated that *Bohen* "ruled out awards of nominal damages to plaintiffs who remained employed." *Gray,* 854 F.2d at 181 n. 3. The court in *Hale* summarized the circumstances as follows:

> The only remedy under Title VII that [this plaintiff] could conceivably get in a

---

**10.** In a post-argument letter to the court, the State indicated that in *Walker v. Anderson Elec. Constr.,* 944 F.2d 841 (11th Cir.1991), the Eleventh Circuit joined the Seventh Circuit in holding that nominal damages are not recoverable under Title VII. In *Walker,* the plaintiff's inability to recover nominal damages in her Title VII suit had nothing to do with the recovery provisions of Title VII *per se.* Rather, nominal damages were unavailable there because plaintiff failed to request a jury instruction for such damages. The court did not rule on the issue of whether nominal damages would have been available under Title VII had plaintiff requested

a jury instruction to that effect. *Walker,* 944 F.2d at 845. Therefore, one cannot conclude from *Walker* that the Eleventh Circuit has joined the Seventh Circuit on the issue of availability of nominal damages under Title VII.

**11.** The Seventh Circuit reversed Judge Easterbrook's district court decision only with respect to issues concerning the equal protection clause of the Fourteenth Amendment. The district court's rationale with respect to availability of nominal damages under Title VII was adopted in its entirety. *Bohen,* 799 F.2d at 1184, 1189.

case like this—since she was not fired, demoted, etc., and since damages cannot be awarded under Title VII—would be an order expunging the offending letter from [the employer's] files and forbidding [the employer] ever to take any adverse action against him on the basis of the letter.

808 F.2d at 620 (citations omitted) (also noting that "Title VII is not a comprehensive tort statute," and that its remedies are not the same as tort remedies). Due to the special circumstances in *Hale,* even expungement was not available in that case, thus leaving the court to conclude that no form of judicial relief could be obtained against the offending party. Accordingly, summary judgment was granted in that case.

Plaintiff has presented no authority refuting the Seventh Circuit's compelling characterization of nominal damages as simply a subset of compensatory damages. The courts having suggested the availability of nominal damages in Title VII cases have done so summarily, without explanation. The Seventh Circuit is the only court to have thoroughly discussed the propriety of awarding nominal damages as equitable relief under Title VII, and it has firmly rejected the practice. *E.g. Swanson,* 882 F.2d at 1240 (nearly identical scenario to the present case); *Bohen,* 799 F.2d at 1184.

To complete the circle, practically every circuit has flatly denied the availability of compensatory damages under Title VII. *See, e.g., Muldrew v. Anheuser Busch, Inc.,* 728 F.2d 989, 992 n. 2 (8th Cir.1984); *Walker v. Ford Motor,* 684 F.2d 1355, 1362–63 (11th Cir.1982) (listing cases); *Bundy v. Jackson,* 641 F.2d 934, 946 n. 12 (D.C.Cir.1981). As the Eighth Circuit noted, "[t]he language of [Title VII] offers only equitable relief, such as reinstatement, whereas compensation for humiliation and emotional suffering is a form of legal relief" not available under Title VII. *Muldrew,* 728 F.2d at 992 n. 2.[12] By requesting nominal damages, plaintiff is

seeking recovery for pain and suffering, which is compensatory relief not permitted by Title VII. *See McGuire v. United States Postal Serv.,* 749 F.Supp. 1275, 1285 (S.D.N.Y.1990) (listing cases).

**(5) Attorney's Fees**

■ Only a "prevailing party" can recover attorney's fees in a Title VII suit. 42 U.S.C. § 2000e–5(k) (1988). That is to say, a threshold to recovery of attorney's fees is that the plaintiff must prevail in the underlying Title VII action. If a plaintiff does not prevail in the underlying action, then she cannot recover attorney's fees under Title VII.

The effect of the "prevailing party" rule is that plaintiff cannot rely upon the possible availability of attorney's fees as a remedy that would allow her to withstand defendants' motion for summary judgment. A suit cannot be maintained for the sole purpose of recovering attorney's fees. *Hale,* 808 F.2d at 620; *Bohen,* 799 F.2d at 1184. Plaintiff must be able to point to some other remedy that will allow her to prevail in her underlying action before she can litigate the availability of fees. Given its prematurity, plaintiff's attorney's fees argument is without merit.

### C. Plaintiff's motion to amend her complaint

Plaintiff understandably seeks leave to amend her complaint, to add causes of action under 42 U.S.C. § 1983 and directly under the equal protection clause of the Fourteenth Amendment. Under Fed. R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." *E.g. Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("*Foman* factors"); *Hanlin v. Mitchelson,* 794 F.2d 834, 840 (2d Cir.1986). Justice does not require the court to grant leave when the amendment would be futile. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230. For the reasons discussed below, justice does not

12. The court notes in passing that provisions for back-pay and fringe benefits lost as a result of sexual discrimination have long been considered equitable, and not legal, remedies. *Al-*bemarle Paper Co.,* 422 U.S. at 418–21, 95 S.Ct. at 2372–73 (discussion of back-pay as an equitable remedy); *Walker,* 684 F.2d at 1364–65 (back-pay and fringe benefits).

require the court to grant leave to amend. Therefore, plaintiff's motion for leave to amend is denied.

The court's consideration of plaintiff's motion is guided by New York's doctrine of *res judicata,* which the court is obliged to apply in this case. *See* 28 U.S.C. § 1738 (1988); *Migra v. Warren City School Distr.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Under New York law, "once a claim [has been] brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, *even if based upon different theories or if seeking a different remedy." O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (Ct.App.1981) (New York application of "transactional analysis") (emphasis added). *Res judicata,* however, operates to bar only those claims which *could* have been raised in a prior proceeding; it does not bar litigation of claims over which the prior tribunal was without authority to adjudicate. *E.g. Antonsen v. Ward,* 943 F.2d 198, 201 (2d Cir.1991); *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986).

In *McLaughlin I,* this court held that plaintiff's instant Title VII action is not barred by *res judicata,* reasoning that plaintiff could not have litigated her Title VII claim in the prior state court proceeding. Plaintiff could not have raised her Title VII claim in state court because she was still awaiting her "right to sue" letter from the EEOC when she commenced her state court action. Receipt of a "right to sue" letter from the EEOC is a jurisdictional prerequisite to initiating a claim under Title VII; since plaintiff did not have a letter, she could not litigate her Title VII claims in state court. Hence, *res judicata* could not bar plaintiff's subsequent Title VII action in this court. *McLaughlin I,* 739 F.Supp. at 107.

The same cannot be said about plaintiff's proposed § 1983 and constitutional claims. Unlike Title VII, neither § 1983 nor the United States Constitution has an administrative prerequisite to bringing suit thereunder. Therefore, plaintiff could have raised these claims in the prior state court proceeding. Moreover, plaintiff *should* have raised her proposed claims in state court. By plaintiff's own admission, both of her proposed claims arise out of the same facts, conduct, transactions, and occurrences as were alleged in her original complaint in this action. Honeywell Aff. (12/18/90), at ¶ 9. Yet, as this court noted in *McLaughlin I,* "[m]any of the same facts which have been alleged in the Title VII action in federal court served as the basis for the state tort suit." 739 F.Supp. at 103. Therefore, as a matter of logic, many of the transactions and occurrences giving rise to plaintiff's proposed amended claims are the same as those raised in her state tort suit, which reached a final conclusion on the merits. Since plaintiff's proposed claims arise from the same transactions and occurrences as those raised in her state court action, and she could have raised them in the state court proceeding, plaintiff is precluded from litigating those claims in this proceeding. The fact that plaintiff seeks relief or remedy under an alternative theory is irrelevant. *See Migra,* 465 U.S. at 81, 104 S.Ct. at 896; *O'Brien,* 445 N.Y.S.2d at 688, 429 N.E.2d at 1159.

Plaintiff contends that her claims arising from her employment at the QWL Committee were not litigated on the merits at the state court level, and therefore she should not be precluded from raising them here. She points in part to the *dicta* in Justice Hughes's state court opinion, that "[the question of] damages caused to the plaintiff as a result of sex discrimination will be addressed by the Division of Human Rights," and therefore not by the state court. *See McLaughlin I,* 739 F.Supp. at 97 (quoting Vol. I, State Court Record, at 7).

Plaintiff's argument to this effect is without merit because it confuses *res judicata* with collateral estoppel. Under *res judicata* analysis, which is the sole basis for today's decision, there are only three relevant and dispositive facts: (1) plaintiff's state claims arose from the same "transactions or occurrences" as her proposed federal claims; (2) plaintiff could have raised her proposed federal claims at

the state court proceeding; and (3) plaintiff failed to do so. The fact that Justice Hughes did not actually rule on the merits of plaintiff's harassment claims, and instead deferred to the DHR, is of no consequence under New York's transactional approach. Plaintiff is precluded from raising her § 1983 claim in this court because she had the opportunity to, but did not, bring a § 1983 claim concurrently with her other claims in state court, and the state action reached a conclusion on the merits.

As stated above, justice does not require the court to grant plaintiff leave to amend her complaint to add futile claims. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230. In light of the preclusive effect of her state court suit on the present action, plaintiff's motion to amend would be futile. Accordingly, plaintiff's motion for leave to amend is denied with prejudice.

### III. CONCLUSION

Defendants' motion for reconsideration is denied. Defendants' motion for summary judgment is denied without prejudice, pending discovery pursuant to the terms set forth in this memorandum. Plaintiff's motion for leave to amend her complaint is denied.

IT IS SO ORDERED.